## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GEORGIA M. BURNS, | ) | |
| | ) | |
| Plaintiff, | ) | 8:11CV309 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner).[1] The plaintiff Georgia M. Burns (Burns) appeals the Commissioner's decision denying Burns' application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (Act), 42 U.S.C. §§ 1381, *et seq.* Burns alleges she was disabled beginning on September 19, 2007, due to fibromyalgia and depression. Burns filed a brief (Filing No. 16) in support of this administrative appeal. The Commissioner filed the administrative record (AR.) (Filing No. 11) and a brief (Filing No. 19) in opposition to Burns' appeal for benefits. Burns filed a brief (Filing No. 20) in reply.

## BACKGROUND

On February 29, 2008, Burns filed an application for SSI benefits alleging she had been unable to work due to a disabling condition beginning September 19, 2007 (AR. 59, 116, 149). In the application, Burns alleged she was disabled due to fibromyalgia and obesity (AR. 28, 59, 132). During the administrative hearing on this matter, Burns stated she is no longer disabled due to obesity, but suffers from fibromyalgia and depression (AR. 28). The Commissioner denied benefits initially and on reconsideration (AR. 57, 59). An administrative law judge (ALJ) held a hearing on June 7, 2010 (AR. 28). On July 12, 2010, the ALJ determined Burns was not disabled within the meaning of the Act (AR. 9-20).

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). **See** Filing No. 15.

Burns appealed the ALJ's determination and submitted additional medical evidence in August 2010 (AR. 5, 7-8). The Appeals Council denied Burns' request for review on July 19, 2011 (AR. 1-5). The Appeals Council concluded Burns' additional evidence and argument did "not provide a basis for changing the ALJ's decision" (AR. 1-2). Burns now seeks judicial review of the ALJ's determination as it represents the final decision of the Commissioner.

Burns appeals the Commissioner's decision, asking that the decision be reversed and benefits awarded because: (1) the Commissioner failed to properly consider new and material evidence, (2) the ALJ failed to properly develop the record as to Burns' mental impairment, (3) the ALJ improperly weighed and evaluated the medical evidence, (4) the residual functional capacity (RFC) determination is unsupported by substantial evidence, and (5) the vocational expert's (VE) testimony does not constitute substantial evidence because the ALJ posed inaccurate hypothetical questions. **See** Filing No. 16 - Brief p. 8, 10, 13, 15, 18. After reviewing the ALJ's decision, the parties' briefs, the record, and applicable law, the court finds the ALJ's ruling, that Burns was not disabled, should be affirmed because it is supported by substantial evidence in the record.

## ADMINISTRATIVE RECORD

**A.    Medical Records**

On April 4, 2007, Burns had her fifth baby without complications and was discharged two days later (AR. 237). On September 20, 2007, Burns attended a postpartum check-up, complaining of weight gain with contraception (Depo Provera shot) (AR. 228). Burns weighed 227 pounds at the exam (AR. 228). Burns had a normal exam and denied any problems with depression (AR. 228).

On January 22, 2008, Burns presented to a medical clinic reporting she had stubbed two toes on her left foot, which hurt to touch and walk (AR. 337). Burns also reported she had arm and leg aches over the last three months that did not improve with ibuprofen use (AR. 337). The aches included weakness, but no swelling (AR. 337). Burns reported the aches were not "bothering her too much" with her current housekeeping job, but caused her to quit an earlier job where she had to stand (AR. 337). During the examination, Burns

2

had no tenderness in her spine, arms, or legs, and walked with a normal gait (AR. 337-338).  The examiner diagnosed Burns with myalgia and toe pain and ordered x-rays and other tests (AR. 338).  Burns was prescribed Naprosyn for pain (AR. 338).

By referral from her primary care physician, William Hay, M.D. (Dr. Hay), on January 31, 2008, Alan Erickson, M.D. (Dr. Erickson), a rheumatologist, examined Burns to diagnose a cause for her joint pain (AR. 334-336).  Burns reported she had pain in her arms and legs for four or five months, possibly longer, with shooting pain, numbness, tingling, diminished strength, tiredness, and muscle soreness (AR. 334).  Burns reported activity worsened the pain and she had to stop for rest three or four times each day when she was working full-time as a housekeeper (AR. 334).  Naprosyn improved some of Burns' symptoms, however Burns reported her pain was a nine during the exam (AR. 334).  During testing, Burns exhibited near-full strength in her extremities with some "giveaway" weakness (AR. 335).  She walked with a normal gait, had intact nerves and normal sensory function, and could get in and out of chair and walk on her heels and tiptoes without assistance (AR. 335).  Burns had no swelling but complained of numbness, weakness, tingling, and headaches (AR. 335).  Burns "had a multitude of soft tissue tender points in the region of her occiput, low cervical, trapezius, supraspinatus, second rib, lateral epicondylar, gluteal, greater trochanter and knee region" (AR. 335).   Dr. Erickson diagnosed Burns with arthralgias and myalgias (AR. 335).  He prescribed Flexeril and ordered additional tests (AR. 335).

On February 12, 2008, Burns had a follow-up appointment with Dr. Hay related to Burns' testing for chest pain (AR. 333).  Dr. Hay noted Burns was "very social" and she reported no exertional-related pain (AR. 333).  Blood testing did not suggest a diagnosis for Burns' chest pain (AR. 333).  Dr. Hay recommended Burns continue to work with Dr. Erickson and obtain an electromyogram (EMG) (AR. 333).  On February 15, 2008, J. Americo Fernandes, M.D. (Dr. Fernandes), determined the nerve conduction and other studies resulted in normal findings, indicating "no definite electrophysiologic evidence of myopathy or of a peripheral neuropathy" (AR. 236).

During a February 21, 2008, examination by Dr. Erickson, Burns reported she worked full-time as a housekeeper but was off work recently and suffered fatigue with pain

3

graded as an eight out of ten (AR. 331).   Burns reported members of her family have fibromyalgia (AR. 331).   Burns exhibited multiple tender points, strength at "4+" out of five "with less giveaway sensation" (AR. 331).   Dr. Erickson noted Burns' blood work and other testing results were normal (AR. 332). Dr. Erickson again diagnosed Burns with arthralgias and myalgias, specifically myofascial pain (AR. 332). Dr. Erickson stressed the importance of regular aerobic exercise and recommended exercise and physical therapy (AR. 332). Dr. Erickson refilled Burns' prescription for Flexeril and noted Burns was also taking Naprosyn (AR. 331).   Dr. Erickson provided Burns with a handout about fibromyalgia and referred her for additional neurological consultation with Dr. Fernandes (AR. 242-244, 332).

On February 29, 2008, Burns had an appointment with Dr. Hay (AR. 241).   Burns reported diffuse muscle pain and requested pain medication (AR. 241).   Dr. Hay assessed Burns with possible fibromyalgia (AR. 241).   He refilled Burns' prescriptions for Flexeril and Naprosyn and prescribed Lyrica for pain (AR. 241).

On referral from Dr. Erickson, Dr. Fernandes examined Burns on March 5, 2008 (AR. 242-244).   Burns reported "[s]ometimes with rest and with her current medications, her symptoms are better and the pain may be gone" (AR. 242).   Burns reported suffering daily headaches with migraine features that improved with Tylenol (AR. 243).   She also reported periods of lightheadedness and depression (AR. 243).   Dr. Fernandes observed Burns walked with a normal gait, had intact cranial nerves, normal muscle tone and bulk, and full arm and leg strength (AR. 243-244).   Burns' coordination and light-touch sensation were intact, however she had mildly decreased pinprick and temperature sensation in her legs (AR. 244).   Dr. Fernandes ordered further testing to evaluate Burns for small fiber neuropathy (AR. 244).   Dr. Fernandes noted Burns "seems to be doing better with current treatment . . . [and] may benefit from physical therapy for her low back pain" (AR. 244).

On March 26, 2008, Burns met with a physical therapist, Robyn Zeplin (Ms. Zeplin) (AR. 279-280).   Burns reported a pain level of eight out of ten, with pain worsening with activity, especially the three flights of stairs she climbed to her apartment (AR. 279).   Burns' pain was "alleviated with relaxing and medicines" (AR. 279).   Burns reported she was the primary caregiver for her five children and could manage all of her activities of daily living (ADLs) (AR. 279).   Ms. Zeplin observed Burns could heel-to-toe walk, squat, and perform

4

"basic transfers" without difficulty, and had normal arm, leg, and trunk range of motion (AR. 279).  Burns said she enjoyed walking (AR. 279).  Ms. Zeplin established a plan for Burns to gradually increase to twenty minutes of walking for exercise, three to four times a week (AR. 280).  Ms. Zeplin recommended Burns complete a daily home exercise program and return for physical therapy twice a week for four weeks (AR. 280).  Ms. Zeplin set a four-week goal for Burns to be able to complete her ADLs with 2/10 to 3/10 pain (AR. 280).  Burns attended only one other session, on April 4, 2008 (AR. 277).  Ms. Zeplin discharged Burns from physical therapy, on May 5, 2008, due to Burns' failure to follow through with the therapy and noted Burns missed or cancelled four scheduled sessions (AR. 277).

On April 17, 2008, Roderick Harley, M.D. (Dr. Harley), a Disability Determination Services (DDS) physician, completed a Physical Residual Functional Capacity Assessment for Burns based on the record (AR. 246-254).  On the form, he noted Burns' primary diagnosis was "possible fibromyalgia" with a secondary diagnosis of obesity (AR. 246).  Dr. Harley determined Burns could lift up to ten pounds frequently and up to twenty pounds occasionally, could stand and walk for up to two hours and sit for up to six hours in an eight-hour workday (AR. 247).  Dr. Harley reviewed and based his opinion, in part, on Burns' March 17, 2008, Daily Activities and Symptoms Report where Burns wrote she could stand for two to three hours at a time and climb three flights of stairs (AR. 151-155).  Dr. Harley found Burns to be "partially credible" because her symptoms were consistent with her diagnosis (AR. 253).  Dr. Harley noted the fibromyalgia diagnosis was fairly recent and expected Burns to have better control of her symptoms over time (AR. 253).  A second DDS physician, Jerry Reed, M.D. (Dr. Reed), reviewed Burns' records and affirmed Dr. Harley's assessment on July 1, 2008, without additional comments (AR. 291).

Also on April 17, 2008, Linda Schmechel, Ph.D. (Dr. Schmechel), a DDS psychologist, used a Psychiatric Review Technique form to complete a mental assessment of Burns based on the record evidence (AR. 255-268).  Dr. Schmechel determined Burns did not have a medically determinable mental impairment (AR. 255).  Dr. Schmechel noted mental health records through March of 2007 had been requested but not supplied (AR. 267).  Significantly, Dr. Schmechel relied on both Burns' complaints of physical limitations and the physical examination records, which do not reflect mental health symptoms (AR.

267).  A second DDS psychologist, Lee Branham, Ph.D. (Dr. Branham), reviewed Burns'
records and affirmed Dr. Schmechel's assessment on July 1, 2008 (AR. 289-290).  Dr.
Branham noted, "The medical evidence does not reveal a psych diagnosis" (AR. 290).

On April 21, 2008, Burns reported to Dr. Hay the Lyrica prescription was "helping
some of the stiffness, quite a bit of the achiness" (AR. 278).  Dr. Hay increased her Lyrica
dosage and recommended she stay off work, despite unremarkable test results, pending
a follow-up appointment with the Neurology department (AR. 278).  During a June 10,
2008, appointment, Burns sought an increase in the dosage of her Lyrica prescription,
stating it "is helping" but taking Lyrica with the Flexeril made her drowsy (AR. 325).  Dr. Hay
increased Burns' Lyrica pain medication and advised her to take the muscle relaxant at
bedtime (AR. 325).  Dr. Hay noted Burns was scheduled to begin water therapy soon (AR.
325).  Dr. Hay recommended Burns schedule a follow-up appointment with him in one
month (AR. 325).

On July 21, 2008, Burns reported to Dr. Hay that she had fallen down some stairs
two weeks earlier injuring her hip and jarring her neck (AR. 323).  Dr. Hay noted Burns was
"actually doing pretty well" but the fall exacerbated her underlying fibromyalgia and caused
additional neck pain (AR. 323).  Dr. Hay observed mild tenderness in Burns' neck and
shoulders (AR. 323).  Dr. Hay made no changes to Burns' medications but noted, again,
that Burns was planning to begin water therapy (AR. 323).

On August 19, 2008, Burns attended an introductory water therapy session and
received a pool pass (AR. 367).  Burns reported her land-based physical therapy did not
help and made her symptoms worse (AR. 366).  During the session, Burns rated her pain
out of the water at eight to nine out of ten and her pain in the water at zero out of ten (AR.
366).  The therapist opined Burns was a good candidate for water therapy and "she does
demonstrate an excellent tolerance to aquatic exercise" (AR. 367).

When Dr. Hay next examined Burns on September 24, 2008, Burns reported she
had fallen on her back at a grocery store, injuring her back, neck, and hip (AR. 321).  After
the fall, Burns went to the emergency room for x-rays (AR. 321).  Dr. Hay recommended
Burns take Naprosyn or ibuprofen for the pain and continue physical therapy (AR. 321).

Dr. Hay increased the dosage for Burns' Lyrica prescription and referred Burns for rehabilitation and to a pain clinic (AR. 322).

Paul Vollmar, M.D. (Dr. Vollmar), a pain specialist, examined Burns on October 8, 2008, regarding Burns' fibromyalgia and fall injuries (AR. 319-320). Burns exhibited intact nerves and full arm and leg strength, but had some tenderness in her back, shoulders, and legs (AR. 320). Dr. Vollmar prescribed Robaxin, a muscle relaxer (AR. 320). Dr. Vollmar ordered an MRI of Burns' neck and back (AR. 320).

On October 9, 2008, Burns saw Matthew A. Mormino, M.D. (Dr. Mormino), an orthopaedic specialist, for pain in her neck and knee caused by Burns' September 23, 2008, fall (AR. 318). Dr. Mormino observed Burns walked with a "markedly antalgic gait," and her knee was swollen, tender, and examination revealed trace effusion with slight laxity (AR. 318). An x-ray of the knee showed no bony injuries (AR. 318). Dr. Mormino ordered an MRI scan (AR. 318), which showed no effusion (AR. 317). Although Burns reported persistent pain, on October 13, 2008, Dr. Mormino diagnosed Burns with a knee sprain and prescribed physical therapy to improve her range of motion and strength (AR. 317). Dr. Mormino recommended Burns return to see him in twelve weeks (AR. 317).

On November 17, 2008, Burns saw Dr. Hay for a follow-up visit (AR. 315). Burns reported she was "still having trouble with her depression" and scheduled an appointment with a psychiatrist to take place three days later (AR. 315). Burns also reported her pain medication, Lyrica, did not seem helpful, despite the increased dosage in September (AR. 315). Burns said she used Naprosyn some days for headaches, but ibuprofen worked better for aches (AR. 315). Burns also reported she felt Flexeril worked better than Robaxin (AR. 315). Burns had not yet scheduled an MRI for her back and neck (AR. 315). Dr. Hay increased Burns' Lyrica dosage, prescribed vitamin D supplements, ordered an MRI, and encouraged Burns to return to the pain clinic (AR. 316). Dr. Hay recommended Burns return to see him in one month (AR. 316).

On January 27, 2009, Burns returned to Dr. Hay's office (AR. 313). Burns reported she had seen a psychiatrist, Paul Fine, M.D. (Dr. Fine), who was treating her for depression and post-traumatic stress disorder (AR. 313). Dr. Hay refilled Burns'

7

prescription for Lyrica and noted Burns was taking Risperdal, which Dr. Hay would monitor (AR. 313).

On March 24, 2009, Burns returned to the pain clinic (AR. 311). Burns reported she was "pretty happy" with her medication's control of pain; she was using ibuprofen, Tramadol, and Lyrica, but would like to try something more effective than ibuprofen (AR. 311). Burns was told to substitute Naprosyn for ibuprofen (AR. 312). Burns had not been using Lyrica for a week, because her prescription ran out, and noticed "quite a difference in her symptoms" (AR. 311). Burns reported, that although she had missed several scheduled clinic and therapy appointments, she would like a referral to physical therapy for her fibromyalgia symptoms (AR. 311).

On March 27, 2009, Burns presented to Dr. Hay complaining of possible carpal tunnel syndrome because of pain in her forearms (AR. 310). Dr. Hay diagnosed Burns with tendinitis, and advised her to use anti-inflammatory medication (AR. 310). Burns declined to use a forearm brace and occupational therapy (AR. 310).

Also on March 27, 2009, Dr. Hay completed a medical questionnaire, seeking specific information about whether Burns could perform "work-related activities" (AR. 362-363). Dr. Hay opined Burns suffered from low mood, low energy, fatigue, muscle aches, and chronic neck, back, and limb pain (AR. 363). In response to a question about Burns' mental status, Dr. Hay wrote she was alert and cooperative, then he wrote, "get report from psychiatry" (AR. 363). Dr. Hay left blank the sections for the physician to describe limitations for ADLs and specific physical restrictions, such as lifting, sitting, walking, and standing (AR. 363). Dr. Hay assessed Burns with a "fair" prognosis, including rehabilitation potential (AR. 362).

Dr. Hay completed a second questionnaire on June 12, 2009, in response to a request from the State of Nebraska's welfare to work program (AR. 360). The form asked Dr. Hay to estimate the hours of work or "job readiness activities" Burns could perform each day (AR. 360). Dr. Hay marked zero hours, stating it would be more than six months before Burns could resume the welfare to work requirements due to her mood, fatigue, and muscle pain (AR. 360).

On June 15, 2009, Burns' psychiatrist, Dr. Fine, provided a hand-written note stating Burns had been his patient for "some time" and he treated her with pharmaco-therapy for stress disorder and depression (AR. 361).   Dr. Fine noted Burns is cooperative and responsive to treatment (AR. 361).   Dr. Fine stated Burns was prescribed Celexa (AR. 361).

Burns continued to treat with Dr. Hay in the Fall of 2009.   On September 8, 2009, Burns reported her "discomfort" rated a nine on a ten-point scale, with pain in her neck, low back, and calves (AR. 306).  Burns said the "Lyrica helps some" (AR. 306).   Burns reported she had not yet gotten the MRI recommended in October and November 2008 (AR. 306). Dr. Hay assessed Burns with a vitamin D deficiency, discontinued Lyrica, and prescribed Neurontin (AR. 307).   Dr. Hay noted Burns was having moderate trouble with depression, although she was not suicidal, and assessed her with "depression" (AR. 306).   Dr. Hay recommended Burns return in two weeks, attend the MRI, and follow-up with both Drs. Fernandes and Fine (AR. 307).   An MRI conducted on October 22, 2009, of Burns' back and neck, showed "mild unconvertebral joint hypertrophy-degenerative changes contribut[ing] to mild neural foraminal narrowing of [Burns'] lower cervical spine" (AR. 339).

On October 23, 2009, Burns returned to Dr. Hay reporting she did not notice any side effects with Neurontin but it was not very effective (AR. 304).   Burns also needed refills on her other medications, including Celexa and Risperdal (AR. 304).   Burns had not seen Dr. Fine in five months (AR. 304).   Dr. Hay filled Burns' prescriptions, except the Risperdal, which Dr. Hay thought should be done by Burns' psychiatrist (AR. 304).   Dr. Hay recommended Burns "aggressively pursue refills" rather than just wait until her next appointment (AR. 304).   Dr. Hay noted Burns' aspect was "slightly depressed" and he assessed her with "depression with a history of psychotic features" (AR. 304).   He also advised Burns to see her psychiatrist more frequently (AR. 304).   Specifically, Dr. Hay warned Burns she needed to "soldier through" her fatigue and achiness to work through the pain and leave her house because staying home would reinforce her feelings of helplessness (AR. 305).   That day, Dr. Hay provided Burns with a form letter excusing her from work until June 1, 2010, without explanation (AR. 198, 305, 385).  Burns was to return to Dr. Hay in one month (AR. 305).

On December 1, 2009, Burns saw Dr. Hay for a follow-up and reported ongoing neck and knee pain for which she thought she needed surgery (AR. 302). After reviewing the MRI results and other records, Dr. Hay opined Burns' knee had no obvious internal derangement, no surgery was indicated, and the neck pain was probably caused by fibromyalgia, rather than the September 23, 2008, fall (AR. 302). Presumably referring to the MRI results, Dr. Hay wrote, "I do not think these abnormalities are significant to cause any significant pain" (AR. 302). Dr. Hay assessed Burns with "depression with a history of psychotic features" (AR. 302). Burns admitted she had not yet seen her psychiatrist, who was planning to retire (AR. 302). Dr. Hay warned Burns that consultation with a psychiatrist and restarting Risperdal was as important to her recovery as treating the fibromyalgia (AR. 303). Dr. Hay offered to refer Burns to a new psychiatrist (AR. 303). Dr. Hay again recommended Burns follow up with Dr. Fernandes (AR. 302).

On January 20, 2010, Burns returned to Dr. Hay complaining of generalized achiness and seeking to refill her Celexa and Risperdal medications (AR. 298). Burns reported she had not seen Dr. Fine but was on the waiting list for a psychiatric appointment with Lutheran Family Services (AR. 298). Noting Burns had "depression with a history of psychotic features," Dr. Hay refilled Burns' prescriptions for Celexa and Risperdal and altered Burns' dosage of Neurontin to increase slowly over the course of several weeks (AR. 299). Dr. Hay recommended Burns return to his office in one month and separately follow up with the pain clinic (AR. 299).

On February 23, 2010, Burns presented to the pain clinic and consulted with Chris Criscuolo, M.D. (Dr. Criscuolo) (AR. 297). Burns reported problems with chronic fatigue and pain in her upper back, shoulders, low back, hips, and buttocks (AR. 297). Dr. Criscuolo changed Burns' medications from Celexa to Savella, which would increase in dosage over time, and ordered a course of trigger-point injections to begin in four weeks (AR. 297).

On May 19, 2010, indicating he had examined her on that date, Dr. Hay provided Burns with a form excusing her from work until January 1, 2011, without explanation (AR. 199, 384). The treatment notes for the May 19, 2010, office visit are not in the record.

Burns' associates wrote letters on her behalf in June 2010. Burns' friend, Raven Brown (Ms. Brown), wrote she has been friends with Burns for twelve years (AR. 201). Ms. Brown says she goes to Burns' house every day to help with housework, cooking, and check on Burns' well-being (AR. 201). Ms. Brown states Burns is unable to do much on her feet due to pain and dizziness (AR. 201). Burns' landlord stated, that in response to Burns' doctor's note, he allowed Burns to move from her third-floor apartment to the ground level due to her difficulty climbing stairs (AR. 203). Barry Burrus, the father of two of Burns' sons, says he takes Burns to the store, helps clean and do things around the house, and sometimes takes his boys for the weekend (AR. 205). Clara Burns, Burns' mother, says that even though she, herself, is disabled, she does some cooking and cleaning for Burns (AR. 207).

On June 11, 2010, Dr. Hay completed a Residual Functional Capacity Questionnaire (AR. 388-391). Dr. Hay indicated Burns' diagnoses were fibromyalgia and "depression, severe [with] psychotic features" (AR. 388). Dr. Hay estimated Burns could sit for less than two total hours and stand and walk for less than two total hours in an eight-hour workday (AR. 390). Dr. Hay gave his opinion Burns could carry more than twenty pounds infrequently, and could carry ten pounds frequently (AR. 390). Dr. Hay indicated Burns required an option to sit or stand while working and she would be absent from work three or more days each month (AR. 391). Dr. Hay assessed Burns' prognosis as "poor" (AR. 388).

On August 2, 2010, Jay G. Kenik, M.D. (Dr. Kenik), a rheumatologist, examined Burns to complete an independent medical evaluation and a Fibromyalgia Residual Functional Capacity Questionnaire (AR. 211-214, 394-396). Dr. Kenik noted Burns was "profoundly tearful" during his interview because she was concerned about her loss of control of her ability to take care of her children (AR. 394-395). Burns reported feeling loss of appetite and other unspecified symptoms of depression (AR. 394). Dr. Kenik wrote, "[Burns'] underlying depression is managed with Celexa" (AR. 394). Burns exhibited full strength and no swelling (AR. 395). Dr. Kenik noted diffuse soft tissue tenderness in each of eighteen tender points, although "it was difficult to distinguish between tender points and her control points [as Burns] felt discomfort everywhere" (AR. 395). Dr. Kenik diagnosed

11

Burns with fibromyalgia, and "significant clinical depression" that represented a "major depressive disorder" and "impact[ed] her normal activities of daily living and self-care as well as the care of her family" (AR. 396). In the questionnaire, Dr. Kenik opined Burns could sit for up to forty-five minutes at a time and stand for twenty minutes at a time, and required an option to sit or stand at will in a work environment (AR. 213). Dr. Kenik also opined Burns would likely need several unscheduled breaks during the work day and would be expected to miss at least three days of work each month (AR. 214).

### B.    Administrative Hearing

At her administrative hearing on June 7, 2010, Burns testified she was thirty-one years old (AR. 34). Burns weighed 159 pounds on the date of the hearing and testified she had lost almost sixty pounds since she filed her disability application (AR. 42). She lost weight by eating less, lying down, and "not wanting to be around nobody" (AR. 43). Burns does not exercise due to pain (AR. 43). Burns completed an eighth grade education and was unable to obtain a GED after two attempts at passing the test (AR. 34). Burns has never been married (AR. 34-35). Burns has five boys who are ages 3, 4, 10, 11, and 13, by three fathers (AR. 35). The ten and eleven year old boys have speech and hearing disabilities (AR. 54-55). Burns is the primary caregiver for the boys who all live with her (AR. 35). Burns receives child support in a total amount of $566 each month from the boys' fathers, who also help care for the children (AR. 35). Burns is able to take her children to day-care as needed during doctor's visits, physical therapy, and the time it takes her to physically recover from her appointments (AR. 209). Burns receives help from her mom, her sister, and a friend to care for the children and complete household tasks like cleaning and cooking (AR. 35, 44). These people also help Burns shop for groceries and run errands (AR. 36). Burns testified she suffers too much pain to drive her car even though she has a driver's license (AR. 36).

Burns received Aid to Families with Dependent Children (ADC), but such benefits ceased after sixty months, despite Burns receiving doctor's notes to excuse her from seeking work (AR. 35). Since losing ADC and medicaid, Burns has some medical assistance through the United Way, but has financial trouble filling her prescriptions (AR.

43-44).   Burns takes Gabapentin, Lyrica, and Tramadol for fibromyalgia, ibuprofen, Lidoderm (Lidocaine) patches, and Flexeril as a muscle relaxer (AR. 43, 379).

Burns testified she has a phobia of people that causes her to start sweating, breathing hard, and become faint, when around a lot of people (AR. 36-37).  This phobia caused Burns to have a "spotty" work history (AR. 37).  Her longest job lasted nine or ten months (AR. 36-37).  Burns has worked in home care to take care of elderly people and clean hospital rooms (AR. 36-39).  Burns testified that in 2007, she worked as a cashier at a grocery store for eight months, several months against her doctor's word and despite her undiagnosed pain (AR. 39-40).

Prior to the current application Burns had filed four disability benefits applications, in the years 1988, 1993, 1999, and 2000 (AR. 28).  Some of these applications were filed on Burns' behalf by her mother (AR. 41).  Burns testified,

> I think I'm disabled . . . because . . . I've been dealing with phobia and stress – distress problems all my life.  I just started seeing psychiatrists in 2000-2001 for . . . help with my stress and depression and stuff because I never was helped with this from getting abused or nothing.   And I think I'm disabled because I can't stand in the kitchen and do nothing but sweep the floor, cooking noodles.

AR. 41-42.

Burns stated she can only stand to cook for three to four minutes at a time (AR. 42).  She does not do any laundry (AR. 42).  When she goes to the grocery store she rides in a motorized cart (AR. 42).  Burns is part of a fibromyalgia support group and an arthritis support group, which she found on the computer to communicate with people who understand her pain (AR. 44-45).  Burns also reads the newspaper (AR. 45).  Burns does not go to movies or restaurants (AR. 45).   Burns testified she can be on her feet approximately twenty minutes before she starts feeling dizzy with weakness in her legs, causing her to have to lie down (AR. 45-46).  Burns states she lays down or reclines "all through the day that's what I do" (AR. 45-46).  Burns also takes a lot of showers to help with the soreness in her back (AR. 46).  She prefers to take baths and soak in hot water, but has to have help getting in and out of a bath tub (AR. 46).

Burns began treating with Dr. Fine for depression in 2003 until he retired in late 2009 (AR. 30-31). Dr. Fine prescribed Celexa (AR. 31). Burns is still taking Celexa, which she has used for eight or nine years and she is "comfortable with it" (AR. 31).

In 2008, Burns fell at a grocery store (AR. 46). The fall caused Burns to suffer neck and back pain that was more severe than she felt with her fibromyalgia, alone (AR. 46). Burns' doctor recommends she goes to the pain clinic once every six months (AR. 48). Burns testified that her doctor at the clinic, Dr. Criscuolo, told her on March 24, 2010, she was not able to work "at this time" (AR. 48). Dr. Hay has been Burns' family doctor for approximately six years (AR. 48).

Anita Howell (Ms. Howell), a vocational expert, testified in response to hypothetical questions posed by the ALJ outlining Burns' age, education, work experience, and work-related limitations (AR. 48-54). Ms. Howell was skeptical whether any of Burns' prior work would qualify as past relevant work (AR. 49-50). The ALJ limited the hypothetical individual to light, unskilled work (AR. 50-51). In an initial hypothetical, the individual could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight-hour work day; and occasionally engage in postural activities such as stoop, crouch, and crawl, but not work on ladders, ropes, or with hazards (AR. 50). Ms. Howell testified the individual could engage in several jobs with those limitations and gave some representative examples such as production assembler and machine operator (AR. 51). The ALJ posed a second hypothetical with the same restrictions except the individual could lift and carry only ten pounds on an occasional or frequent basis and she was limited to unskilled, routine, repetitive sedentary work where she could sit for at least six hours in an eight-hour day and standing or walking would not exceed two hours in an eight-hour day (AR. 51-52). Ms. Howell testified the individual would retain 80-85% of the jobs in the sedentary range (AR. 53). Specifically, the individual could engage in several jobs with those limitations and gave some representative examples such as a final assembler and a food and beverage order clerk, as defined by Dictionary of Occupational Titles (AR. 52). Ms. Howell testified these jobs exist in significant numbers in Nebraska and in the four-state region as provided by the U.S. Department of Labor Bureau of Labor Statistics and the Nebraska Department of Labor (AR. 52). Ms. Howell testified that based on Burns'

14

testimony during the hearing, Burns would be prevented from engaging in any gainful employment (AR. 54).  Ms. Howell's opinion was based on the testimony describing Burns' level and severity of pain, limiting standing to twenty minutes, having to lie down a lot during the day, having people help her with the majority of housework, and having difficulty being around people (AR. 54).

## THE ALJ'S DECISION

The ALJ concluded Burns was not disabled under the Act and was not entitled to any SSI disability benefits (AR. 20).  The ALJ framed the issue as whether Burns was eligible for benefits as a disabled individual under § 1614(a)(3)(A) of the Act since February 29, 2008, the date the application was filed (AR. 12).  As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to physical or mental impairments (AR. 12).  **See** 42 U.S.C. § 1382c(a)(3)(A).  These impairments must be expected to result in death or must last for a continuous period of at least twelve months.  *Id.*

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations.  **See** 20 C.F.R. § 416.920(a)(4); *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any [SSI] listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citation omitted); **see** *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).  More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience.  **See** 20 C.F.R. § 404.1520(a).  If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled

15

> without considering age, education, or work experience. If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy. A claimant's residual functional capacity is a medical question.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (internal citations omitted). "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); **see** *Kluesner*, 607 F.3d at 536.

In this case, the ALJ followed the appropriate sequential analysis. At step one, the ALJ found Burns had not engaged in any substantial gainful activity since February 29, 2008 (AR. 14). At step two, the ALJ found Burns has "severe impairment: Fibromyalgia and moderate depression controlled with medication" (AR. 14). With regard to depression, the ALJ determined Burns had mild restrictions in daily living and social functioning, mild to moderate limitations in concentration, and no episodes of decompensation (AR. 14). At step three, the ALJ determined Burns does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926) (AR. 15).

Nevertheless, the ALJ found Burns' ability to perform work-related functions, or a residual functional capacity (RFC), is limited such that Burns could only perform:

> sedentary work as defined in 20 CFR 416.967(a) except she is limited to occasional postural activities, no work on ladders, and no work around hazards. She is limited to unskilled, routine, repetitive work with an SVP of 1 or 2.

(AR. 15).

The regulation defines sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are

> sedentary if walking and standing are required occasionally
> and other sedentary criteria are met.

20 C.F.R. §416.967(a).

The ALJ did not give significant weight to Burns' treating physician, Dr. Hay (AR. 16). The ALJ stated Dr. Hay "essentially excuses the claimant from working but does not reasonably assess her limitations" (AR. 16). The ALJ found Dr. Hay's physical assessments to be internally inconsistent and contradictory (AR. 16). Moreover, Dr. Hay diagnosed Burns with "depression, severe with psychotic features" and continued to prescribe Celexa despite his deferral in forms to "get results from psychiatry" (AR. 16 (**citing** AR. 373-374)). The ALJ found "little, if any, evidence" in the record to support this diagnosis (AR. 16). Also despite referrals, Burns had not attended counseling for more than one year and her depression symptoms were controlled with medication (AR. 16).

Similarly, the ALJ did not find Burns' testimony credible to the extent Burns testified the intensity, persistence, and limiting effects of her symptoms are inconsistent with the ALJ's RFC assessment (AR. 16). The ALJ opined Burns "has activities of daily living and familial obligations at home . . . clearly demonstrat[ing] considerable residual function capacity" as a single parent caring for five sons, two who have hearing and speech problems (AR. 17). Additionally, the ALJ noted Burns can use a computer and is comfortable taking her medication (AR. 17). The ALJ relied on the record evidence that this is Burns' fifth application for disability benefits, her earnings records show zero to low earnings even in years for which she does not seek benefits, she has not shown any motivation for work and ADC terminated benefits for failure to participate in job seeking classes (AR. 17). The ALJ noted Burns quit her last two jobs (AR. 17). The ALJ did not give great weight to the statements provided by Burns' mother, landlord, and friends because the statements appeared to unreasonably overstate Burns' impairments (AR. 17).

Next, the ALJ assessed Burns' job history and potential employability. At step four, the ALJ determined Burns has no past relevant work (20 C.F.R. § 416.965) (AR. 18). At step five, the ALJ relied upon the testimony of the VE, finding a person of Burns' age, education, and RFC could perform a limited amount of unskilled sedentary work in various occupations that exist in the regional and national economies in significant numbers (AR.

18).   Based on the VE's testimony, the ALJ found Burns' limitations still enable her to engage in eighty to eighty-five percent of all unskilled, sedentary jobs (AR. 18-19).   The ALJ determined, that because Burns retained the RFC for such unskilled sedentary labor, she was not disabled under the Act or entitled to disability benefits (AR. 19).   Burns sought review of the ALJ's decision by the Appeals Council.   On January 19, 2011, the Appeals Council denied the request for review (AR. 1-5), despite considering additional evidence including Dr. Kenik's August 2, 2010, questionnaire and letter (AR. 5, 211-214, 394-396).

Burns appeals the Commissioner's determination on five grounds.   **See** Filing No. 16 - Brief p. 8, 10, 13, 15, 18.   First, Burns argues the Commissioner failed to properly consider material evidence submitted after the hearing.   Second, Burns contends the ALJ failed to properly develop the record as to Burns' mental impairment.   Third, Burns argues the ALJ improperly weighed and evaluated the medical evidence.   Fourth, Burns asserts the ALJ's RFC determination is unsupported by the record.   Finally, Burns contends the VE's testimony does not constitute substantial evidence because the hypothetical questions posed were inaccurate.   The court will address each issue below.


## STANDARD OF REVIEW

A district court is authorized jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g).   **See also** 42 U.S.C. § 1383(c)(3).   A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).   Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.   *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard").   "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).   "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v.*

*Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). The court reviews questions of law *de novo*. **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d at 835; *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007). Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578.

## DISCUSSION

### A.    The Appeals Council's Consideration of New Evidence

Burns argues the Appeals Council failed to properly assess the evidence she submitted after the ALJ issued the January 22, 2010, decision. **See** Filing No. 16 - Brief p. 8. Specifically, Burns asserts the Appeals Council's treatment of the new evidence was cursory, rendering the ultimate decision unsupported by the evidence. *Id.* Further, Burns contends, that since the Appeal Council considered the new evidence, the court takes the new evidence as part of the record when determining whether the ALJ's decision is supported by substantial evidence on the record as a whole. *Id.*

The new evidence consists of Dr. Kenik's medical evaluation (AR. 394-396) and fibromyalgia form questionnaire (AR. 211-214). Burns argues Dr. Kenik's opinions are inconsistent with the ALJ's determination of Burns' RFC, but consistent with Dr. Hay's opinions. *Id.* at 10; Filing No. 20 - Reply p. 1. Further, Burns argues Dr. Kenik's medical evaluation is timely and material to a determination about the severity of Burns' mental and physical impairments. **See** Filing No. 16 - Brief p. 8-10. Dr. Kenik, a specialist in rheumatology, examined Burns within three weeks of the July 12, 2010, hearing decision. **Compare** AR. 20 **with** AR. 394. Specifically, Burns argues Dr. Kenik's opinions necessarily bolster Dr. Hay's opinions and, if considered by the ALJ, would have led the ALJ to give Dr. Hay's opinions more weight. *Id.* at 9-10. The ALJ discounted Dr. Hay's opinions because they did "not reasonably assess [Burns'] limitations[,]" however Dr. Kenik's opinions are consistent with Dr. Hay's opinions and provide some additional limitation assessments. *Id.* at 9-10.

Under the Social Security Regulations:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the ALJ hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b); **see** *Whitney v. Astrue*, 668 F.3d 1004, 1006 (8th Cir. 2012).  "To be new, evidence must be more than merely cumulative of other evidence on the record." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008).  "[E]vidence is material if it is 'relevant to claimant's condition for the time period for which benefits were denied.'" *Id.* (**quoting** *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000)).  "The Appeals Council's failure to consider the evidence 'may be a basis for remand by a reviewing court.'" *Whitney*, 668 F.3d at 1006 (**quoting** *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995)).

The Appeals Council explicitly stated it did consider the evidence (AR. 1, 5). Accordingly, this court does not review the Appeals Council's decision to consider the evidence or deny review of the case.  **See** *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).  Similar to the Appeals Council's appraisal of the case, this court will uphold the ALJ's decision if supported by substantial evidence in the record as a whole, including Dr. Kenik's opinions.  **See** *id.*; **see also** *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).  The court will address Dr. Kenik's opinions about Burns' mental and physical limitations with the other evidence below.

## B.    Mental Health

Burns states her depression may constitute a severe impairment and may impose more than a minimal limitation on her ability to perform substantial gainful employment. **See** Filing No. 16 - Brief p. 12-13.  Burns argues these statements and the record evidence obligated the ALJ to further develop the record and order a consultative psychological evaluation.  *Id.* at 13.  Burns notes the record reflects her having behavioral and academic

problems in school, treating with Dr. Fine since 2003, and taking Celexa for eight or nine years to relieve symptoms of stress and depression. *Id.* at 11; **see also** AR. 30-31, 349-354, 361. Additionally, Burns reports she has had difficulty around people, causing her depression and nervousness; mental problems all her life; low energy; a depressed mood; and poor concentration. **See** Filing No. 16 - Brief p. 11-12; **see also** AR 37-38, 41, 184, 373-374. Dr. Fine's treatment notes are not part of the record, but Dr. Fine provided a June 15, 2009, hand-written note to confirm he treated Burns "for some time." **See** AR. 267, 361. Two DDS psychologists reviewed the record, including the physical examination records, to conclude Burns did not have a medically determinable mental impairment. **See** AR 255-268, 289. In 2007, Burns' treating physician, Dr. Hay, opined Burns suffered depressive psychosis and severe depression. **See** AR. 373, 375. Similarly, Dr. Kenik opined Burns suffered "severe clinical depression . . . represent[ing] a major depressive disorder that is impacting her normal activities of daily living and self-care as well as the care of her family." **See** AR. 396.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." ***Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007)*. Although the requirement of severity is not an "onerous requirement," neither is it a "toothless standard." ***Id.** at 708*. An "impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." ***Kirby**, 500 F.3d at 708* (**citing ***Bowen v. Yuckert**, 482 U.S. 137, 153 (1987)* (noting "the impairment would have no more than a minimal effect on the claimant's ability to work")); **see** 20 C.F.R. § 404.1521(a). When considering the severity of mental impairments, the ALJ should consider four functional areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in the first three functional areas are rated as "none" or "mild," and "none" in the fourth area, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates there is more than a minimal limitation in the ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).

"Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) (**citing** *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)).  The same is true even where the symptoms may sometimes worsen, requiring adjustments in medication, as long as the impairment is generally controllable. *Davidson*, 578 F.3d at 846.  Likewise, the absence of evidence of ongoing counseling or psychiatric treatment or of deterioration or change in the claimant's mental capabilities disfavors a finding of disability.  See *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (concluding that a history of working with an alleged impairment, with no deterioration, was evidence that it was not severe).  Even when doctors previously concluded that a claimant's mental impairment or depression was a major factor preventing her from working, subsequent failure to treat, lack of deterioration and ongoing ability to function supports a finding the impairment is not severe.  See *Gowell v. Apfel*, 242 F.3d 793, 797-98 (8th Cir. 2001); **see also** *Schultz v. Astrue*, 479 F.3d 979, 982-83 (8th Cir. 2007) ("Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work.").  However, an ALJ should consider whether the claimant's failure to take medication or seek treatment is the result of a medically determinable symptom of the mental impairment rather than merely willful, justifiable, or unjustifiable noncompliance.  See *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009); *Wildman v. Astrue*, 596 F.3d 959, 965-66 (8th Cir. 2010) (noting depression is distinguishable from schizoaffective disorder and absent evidence showing noncompliance linked to mental limitations, noncompliance with doctor's instructions is a valid reason for discrediting subjective complaints).

Substantial evidence in the record supports the ALJ's finding that Burns' depression was non-severe.  The ALJ noted Burns' depression is controlled with medication (AR. 14-15, 17).  Burns treated with psychiatrist Dr. Fine who reported Burns' symptoms were responsive to Celexa (AR. 361).  Burns confirmed she is "comfortable" with Celexa, which she had been taking for eight or nine years (AR. 31).  Additionally, Dr. Hay noted Burns "had some trouble with some psychotic features[, which] resolved" after a change in medication by adding Risperdal (AR. 313).  Dr. Hay's treatment notes do not explain the resolved or any unresolved psychotic features.  Although Burns complained of moderate

22

trouble with her depression to Dr. Hay, in September 2009, he noted she failed to attend follow-up appointments with Dr. Fine and went more than five months without treatment or medication (AR. 298-299, 302-303, 304, 306).  Dr. Hay did not prescribe Risperdal to Burns until January 20, 2010, when he recommended for the fourth consecutive visit that Burns return to see Dr. Fine or find a new psychiatrist (AR. 298-299, 302-303, 304, 307). Dr. Hay provided his opinion on questionnaire forms diagnosing Burns with "severe depression," but he deferred any specific psychiatric opinions to Burns' psychiatrist (AR. 362-363, 388).  Dr. Kenik, a rheumatologist, described Burns as "profoundly tearful" during her examination on August 2, 2010, noting, however, Burns' "underlying depression is managed with Celexa" (AR. 394).  Dr. Kenik wrote Burns has "major depression" and checked her symptoms to include breathlessness, anxiety, and panic attacks (AR. 211). By contrast, Dr. Hay did not similarly indicate these symptoms when he used the same form (AR. 388).  Similar to Dr. Hay's opinions, Dr. Kenik's opinions do not describe how Burns' depression impacts her activities of daily living (AR. 394, 396).

Throughout the record, treatment notes and other evidence indicate Burns' mental impairment could be regulated by medication and her limitations were not as severe as Drs. Hay and Kenik wrote.  Neither doctor specialized in psychiatry.  Dr. Hays opinions were internally inconsistent and appeared to rely on Burns' self-reports of Dr. Fine's assessments.  Dr. Kenik's opinions were materially inconsistent with Burns' treating physician's assessments, contrary to Burns' hearing testimony and other medical evidence, and relied heavily on Burns' subjective complaints made during the interview.  Specifically, Dr. Kenik, a one-time examiner, opined Burns suffered additional and more severe symptoms than those observed by Dr. Hays, Burns' family doctor for six years.  **Compare** AR. 211 **with** AR. 388.  Although he may have had access to Burns' medical records, there is no evidence Dr. Kenik relied on his review of other records to form his opinion, as he specifically stated "[Burns] reported that Dr. Erickson felt she had fibromyalgia" (AR. 394). Dr. Kenik was a consulting physician.  A consulting physician's opinion is entitled to no special weight and may be assessed little weight when it is based largely on the claimant's subjective complaints and a contrary view is supported by better medical evidence.  **See** *Kirby*, 500 F.3d at 709.  Moreover, the subjective complaints made to Dr. Kenik contradict

23

Burns' hearing testimony and statements made to another doctor.  For example, Burns testified she was comfortable with her depression medication, which had remained unchanged for many years (AR. 31).  There is no evidence in the record Burns was hospitalized for her depression and any psychotic features attributed to her depression resolved with medication (AR. 313).  Many of Drs. Hay's and Kenik's statements about Burns' inability to work due to depression were unsubstantiated and unsupported in the record.

In this case, the evidence in the record does not otherwise indicate more than a minimal limitation in Burns' ability to do basic work activities due to a mental impairment.  The remaining evidence in the record about Burns' mental impairment supports the ALJ's opinion.  Additionally, the evidence fails to show Burns had more than mild limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, and the record shows no episodes of decompensation.  Under these circumstances, a finding the impairment is "not severe" is generally appropriate.  The ALJ limited consideration of Burns' RFC to unskilled labor due to record evidence about Burns' intellectual functioning and work history.  Accordingly, the court finds no error in the ALJ's finding Burns' depression was not a severe impairment under the Social Security regulations and rulings.

Finally, the ALJ did not err by failing to obtain updated psychological evaluations or expand the record when the claimant explicitly stated she was comfortable with her medication, sought treatment for the stress she had been dealing with her whole life, and was disabled due to her physical problems (AR. 41-42).  Burns' initial application did not seek benefits based on depression (AR. 59, 132) and the medical records, particularly her complaints to her primary care physician and failure to consistently treat without more severe consequences, support the ALJ's finding that Burns does not suffer a severe mental impairment.  Despite the fact that there may be evidence in the record to support Burns' argument, "[w]hether the record supports a contrary result . . . is immaterial." ***Tellez v. Barnhart***, 403 F.3d 953, 956 (8th Cir. 2005).  The circumstances of this case did not obligate the ALJ to further develop the record or order a consultative evaluation regarding Burns' mental health.

**C.     Treating Physician's Opinions**

The ALJ weighs and evaluates the medical opinions when making a determination. "A treating physician's opinion is given controlling weight if it 'is well supported by medically acceptable clinical and laboratory diagnostics techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **_Halverson v. Astrue_, 600 F.3d 922, 929 (8th Cir. 2010)** (alteration in original) (**quoting _Tilley v. Astrue_, 580 F.3d 675 (8th Cir. 2009)**).  Treating physicians' opinions carry less weight when inconsistent or contrary to opinions of other physicians, especially physicians whose opinions are supported by more or better medical evidence. **_Teague v. Astrue_, 638 F.3d 611, 615 (8th Cir. 2011)**. If an opinion is largely based on a claimant's subjective complaints rather than objective medical evidence, the ALJ can properly discount the opinion. **_Wildman_, 596 F.3d at 967**. "[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight." **_Id._ at 964** (alteration in original).

Burns argues the ALJ erroneously failed to give significant weight to Dr. Hay's opinions based on his role as a treating source. **See** Filing No. 16 - Brief p. 13.  In particular, Burns contends the ALJ erred by discounting Dr. Hay's RFC opinions and severe depression diagnosis. **_Id._** at 15.  The ALJ specifically addressed the weight he attributed to Dr. Hays' opinions by stating, he "has not given significant weight to the opinion of William Hay, M.D., a treating source" (AR. 16 (**citing** AR. 386-391 - June 11, 2010, Questionnaire)).   Specifically, the ALJ wrote Dr. Hay "essentially excuses the claimant from working but does not reasonably assess her limitations" (AR. 16).  The ALJ found Dr. Hay's physical assessments to be internally inconsistent and contradictory (AR. 16).  The ALJ gave the example Dr. Hay stated Burns could lift more than twenty pounds infrequently, which exceeds the demands for sedentary work, but limited her to four hours of work each day, at one time, and another time opined Burns needed day care due to fatigue and pain (AR. 16).  Similarly, Dr. Hay provided Burns with notes excusing her from work and work-related training, without explanation, stating she could engage in zero hours of job readiness activities (AR. 16).  The ALJ determined Dr. Hay's treatment notes and

the record did not support Dr. Hay's diagnosis of depression, severe with psychotic features, generally undermining Dr. Hay's opinions (AR. 16).  Nevertheless, the ALJ found, somewhat consistent with Dr. Hay's opinions, that Burns has fibromyalgia, a severe impairment (AR. 14).

Dr. Hay's opinions are not entitled to controlling weight based on the record before the court.  Dr. Hay's opinions are not supported by medically acceptable clinical and laboratory diagnostics techniques.  The few objective tests Burns underwent did not support Dr. Hay's opinions that Burns could engage in little or no work activity.  For example, Burns' October 22, 2009, MRI revealed abnormalities in Burns' cervical spine that, according to Dr. Hay, were not "significant to cause any significant pain" (AR. 302, 339).  Dr. Hay appears to have relied almost entirely on Burns' reports of pain and symptoms of depression.  Additionally, Dr. Hay also appears to have relied on Burns' reports of Dr. Fine's depression diagnosis.  Even so, Dr. Hay repeatedly encouraged Burns to attend physical and psychological therapy, make appointments with the pain clinic and her rheumatologist, and "soldier through" her fatigue and achiness to work through the pain (AR. 305).  Dr. Hay's reliance on Burns' self-reports of pain are also inconsistent with the other evidence.  For example, the record shows Burns found relief from her pain with medication and therapy.  On March 5, 2008, Dr. Fernandes noted Burns "seems to be doing better with current treatment . . . [and] may benefit from physical therapy for her low back pain" (AR. 244).  On March 26, 2008, Ms. Zeplin noted Burns reported her pain was "alleviated with relaxing and medicines," she could manage all of her ADLs, and enjoyed walking, which would help decrease pain with ADLs (AR. 279).  On April 21, 2008, Dr. Hay wrote Burns reported medication was "helping some of the stiffness, quite a bit of the achiness" (AR. 278).  On July 21, 2008, Burns was "actually doing pretty well" except she had injured herself when she fell down some stairs (AR. 323).  On August 19, 2008, Burns reported her pain while doing water therapy was a zero out of ten (AR. 366).  Burns failed, however, to follow her doctors' recommendations with respect to attending therapy and follow-up appointments and obtaining medical testing for the purpose of reducing her symptoms.  Similarly, Burns failed to treat other injuries she sustained during the same time period.  Burns' second fall on September 23, 2008, exacerbated her pain (AR. 321-

322) and led to a diagnosis of a knee sprain, which Dr. Mormino thought would improve with strengthening and physical therapy (AR. 317).  Later, Burns was diagnosed with tendintis in her forearms, for which she declined a brace and physical therapy (AR. 310).

Dr. Kenik's opinions, even if consistent with Dr. Hay's opinions, do not compensate for the problems noted above.  Dr. Kenik's opinions suffer some of the same problems as Dr. Kenik appears to have relied entirely on Burns' reports of symptoms and limitations.  Additionally, Dr. Kenik's opinions fail to provide a reasonable assessment of Burns' limitations.   The opinions are mostly conclusory without explanation or analysis.  Importantly, like Dr. Hay, Dr. Kenik does not specialize in psychiatry.  Finally, Dr. Kenik examined Burns only once, yet found more severe symptoms than her long time physician.

Accordingly, the record supports the ALJ's determination to discount Dr. Hay's RFC opinions.  The court will address the ALJ's RFC findings in more detail below.

## D.    Residual Functional Capacity

Burns argues the ALJ's RFC findings are unsupported by substantial evidence in the record because the ALJ misunderstood Burns' daily activities, failed to give Dr. Hay's opinions proper weight, and failed to properly develop the record.  **See** Filing No. 16 - Brief p. 17.  Specifically, Burns references the limitations imposed by Dr. Hay, and echoed by Dr. Kenik, that Burns needs to be able to change from a sitting to standing position at will, take unscheduled rests, and would be unpredictably absent from employment three or more days each month.  *Id.* at 16 (**citing** AR. 388-391 - Hays' RFC Questionnaire and AR. 211-214 - Kenik's Fibromyalgia Questionnaire).  As discussed above, the ALJ permissibly discounted these opinions.  Even so, Burns argues the ALJ could rely on no other medical authority in the record to support the RFC finding.  *Id.*  Burns contends the ALJ's reliance on Drs. Harley and Reed do not provide substantial evidence to support the RFC finding because those doctors did not examine Burns and did not have the benefit of reviewing Dr. Hay's June 11, 2011, report when they wrote assessments in early 2008.  *Id.*  Moreover, Burns asserts Dr. Harley incorrectly opined Burns' condition would show "improvement over time."  *Id.* (**citing** AR. 253).  Burns contends this lack of substantial medical evidence to support the RFC would require the ALJ to further develop the record.  *Id.* at 17.

There must be substantial evidence on the record as a whole to support the ALJ's RFC determination. *Davidson*, 578 F.3d at 841. Substantial evidence is relevant evidence a reasonable mind would accept as adequate to support a decision. *Id.* It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). RFC is the most the claimant can still do despite physical and mental limitations based on the evidence in the case record. 20 C.F.R. § 404.1545(a)(1). The claimant is responsible for providing evidence to establish the RFC. **See** 20 C.F.R. § 404.1545(a)(3). Even so, the ALJ is responsible for developing the complete medical history. *Id.* The ALJ's determination of a claimant's RFC "must be supported by some medical evidence of the claimant's ability to function in the workplace." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). In addition to the relevant medical evidence, the ALJ bases the RFC assessment on the relevant non-medical evidence including: statements and observations provided by the claimant and claimant's family, friends, or other persons. **See** 20 C.F.R. § 404.1545(a)(3). When considering the claimant's subjective complaints of pain, the ALJ evaluates "1) the claimant's daily activities, 2) the duration, frequency and intensity of pain, 3) precipitating and aggravating factors, 4) the dosage, effectiveness and side effects of any medication, and 5) functional restrictions." *Teague*, 638 F.3d at 615. When there are inconsistencies in the claimant's testimony, the ALJ may properly discount part of the testimony. *Id.* Similarly, as discussed in more detail above, the ALJ may discount conclusions from a medical expert or treating physician if the conclusions are inconsistent with the record as a whole. *Teague*, 638 F.3d at 615-16. Evidence which both supports and detracts from the decision is considered when determining whether substantial evidence supports the ALJ's decision. *Wildman*, 596 F.3d at 964.

The opinions of a non-treating, non-examining physician, alone, "do not normally constitute substantial evidence on the record as a whole." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("Certainly, there are circumstances in which relying on a non-treating physician's opinion is proper.") (**quoting** *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003)). Further, "the opinions of nonexamining sources are generally . . . given less weight than those of examining sources," however when evaluating a

nonexamining source's opinion, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." *Wildman*, 596 F.3d at 967 (**citing** 20 C.F.R. § 404.1527(d)). "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004); **see** 20 C.F.R. § 404.1527(e). An ALJ does not err by considering the opinion of a state agency medical consultant along with the medical evidence as a whole. *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006) (having determined the treating physician's opinions were inconsistent with the record the ALJ properly relied on non-treating, non-examining physician medical sources).

Dr. Harley evaluated Burns based on her medical record and history in conjunction with her primary diagnosis of fibromyalgia with a secondary diagnosis of obesity (AR. 246). Dr. Harley determined Burns could lift up to ten pounds frequently and up to twenty pounds occasionally, could stand and walk for up to two hours and sit for up to six hours in an eight-hour workday (AR. 247). Dr. Harley found Burns to be "partially credible" and relied on her reports of activity, to some extent, because her symptoms were consistent with her diagnosis (AR. 253). Dr. Harley noted the fibromyalgia diagnosis was fairly recent and expected Burns to have "better control of [her] symptoms . . . with time" (AR. 253). Dr. Reed affirmed Dr. Harley's assessment without additional comments (AR. 291). The ALJ gave weight to Dr. Harley's assessment because it "is based on clinical findings and is consistent with the other substantial medical evidence of record" (AR. 16). Dr. Harley's April 17, 2008, opinion, although it predated Dr. Hay's June 11, 2010, report, was relevant to the period of Burns' alleged September 19, 2007, disability onset date. Drs. Hay's and Kenik's later form reports were not entitled to significant weight, as discussed above. Dr. Harley's opinion was consistent with the medical evidence at the time of the opinion. The ALJ could properly rely on Dr. Harley's assessment to determine Burns' RFC.

The ALJ also evaluated the non-medical evidence to determine Burns' RFC. The ALJ found Burns "clearly demonstrates considerable residual functional capacity" based on her parenting responsibilities and ADLs (AR. 17). Burns contends the ALJ

misunderstood her parenting responsibilities and overlooked her statement that she is never alone with her children because she has another adult with her when the children are not attending school or daycare.  **See** Filing No. 16 - Brief p. 17 (**citing** AR. 209).  The ALJ provided additional justification found in the record to discount Burns' statement.  For example, the ALJ discounted Burns' credibility due to Burns' ability to use a computer, comfort taking Celexa, and failure to follow through with prescribed treatment and therapy (AR. 17).  Moreover, the ALJ noted Burns' earning record showed "zero to low earnings even during years for which she is not alleging disability" and Burns failed to demonstrate any motivation to work, and lost or quit jobs unrelated to her alleged disabilities (AR. 17).  Similarly, the ALJ did not give great weight to the statements provided by Burns' friends and relatives due to their "natural concern and devotion" leading them to likely place unreasonable limitations on Burns' daily activities (AR. 17).  Based on these facts present in the record, the ALJ could properly discount Burns' allegations of the severity and intensity of her symptoms.

The record provides substantial evidence to support the ALJ's RFC determination. The record supports the ALJ's determination to rely on Dr. Harley's medical opinions while discounting Dr. Hay's RFC opinions and the non-medical evidence in the record to determine Burns' RFC.  With consideration to the record as a whole, the ALJ's determination to limit Burns to a reduced range of sedentary work is supported by substantial evidence in which the medical evidence was properly weighed and evaluated.

## E.    Vocational Expert

Burns argues the ALJ's hypothetical question posed to the VE was inaccurate and incomplete due to faulty RFC findings, which were not supported by substantial evidence. **See** Filing No. 16 - Brief p. 19.  Specifically, Burns contends Drs. Hay's and Kenik's opinions, particularly with regard to Burns' mental impairment, and proposed record development were wrongly excluded from the hypothetical and not considered by the VE. *Id.*  The failure to include such evidence in the hypothetical, according to Burns, renders the VE's opinion incapable of rising to the level of substantial evidence supporting the ALJ's determination.  *Id.*

30

"In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include 'all the claimant's impairments supported by substantial evidence in the record as a whole'." *Swope v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir. 2006) (**quoting *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005)); see *Jones*, 619 F.3d at 972**. The ALJ may rely on vocational expert testimony as "substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2010). The ALJ's hypothetical question must include credible impairments and limitations and does not need to use specific or symptomatic terms to describe the impairments where other descriptive terms can be adequately used. *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010). The ALJ may omit alleged impairments from the hypothetical question when the record does not support the claimant's contention that the impairment is a significant restriction on performing gainful employment. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011). Similarly, when substantial evidence supports the ALJ's finding that a mental limitation is "nonsevere," the ALJ need not include the mental limitation in the hypothetical. *Id.*

The ALJ relied on Burns' testimony, daily activities, and skills in conjunction with the medical evidence to formulate the hypothetical to the VE. The hypothetical posed to the VE in this case included the impairments the ALJ found to be substantially supported by the record as a whole and captured the concrete consequences of Burns' deficiencies due to her fibromyalgia and moderate depression. The ALJ described a hypothetical individual's RFC, identical to Burns' RFC, to the VE as unskilled, sedentary work (based on the ability to frequently lift or carry ten pounds), and stand or walk for two hours and sit for six hours in an eight hour day (AR. 51-52). The VE listed three different jobs, as representative examples, an individual with Burns' RFC could perform: 1) final assembler, 2) order clerk, and 3) call-out operator (AR. 18-19, 52). The VE gave her opinion these jobs, which accommodated Burns' supported limitations, existed in significant numbers in Nebraska (AR. 18, 51). The VE's opinion was based on all of Burns' relevant impairments. The ALJ's hypothetical was accurate compared to the RFC and the record as a whole.

31

Therefore, the VE's testimony constitutes substantial evidence supporting the ALJ's determination Burns was not disabled under the Act.

## CONCLUSION

The court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, should not be reversed or remanded.  The ALJ's decision does not contain the errors alleged by Burns.  Specifically, substantial evidence in the record supports the ALJ's decision with regard to the Commissioner's consideration of Dr. Kenik's opinions, the weight the ALJ assigned to Dr. Hay's opinions, Burns' RFC and mental impairment, and the accuracy of the ALJ's hypothetical questions posed to the VE. Accordingly, the Commissioner's decision is affirmed.

**IT IS ORDERED:**

The Commissioner's decision is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 23rd day of July, 2012.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.